UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
BURTON N. PUGACH, LEW MARKUS,
MICHAEL BLANCHARD, as Managing Agents
for St. Stephens Community Development Corp.
and St. Stephens Bible College Real Estate
Management Corp. appearing Qui Tam, on behalf
of the United States of America, and GORDON
HILYARD, as Director of St. Stephens Community
Development Corp. and St. Stephens Bible College
Real Estate Management Corp.,

               Plaintiffs,                          MEMORANDUM AND ORDER

               - against -                     2:05-cv-02498-ENV-MLO

M&T MORTGAGE CORP.,

               Defendant.
-----------------------------------------------------------------X

VITALIANO, D.J.

On October 8, 2007 this Court granted defendant's motion to dismiss plaintiffs' claims under the False Claims Act, 31 U.S.C. §§ 3729, 3730(b), and held that an award of attorneys' fees pursuant to 31 U.S.C. § 3730(d)(4) was appropriate because plaintiffs had brought and maintained a frivolous action and had done so vexatiously. Defendants have submitted affirmations in support of their request for $244,408.02 in total attorneys' fees and costs, a sum that plaintiffs oppose. For the reasons set forth below, the Court finds that an award of $81,303.83 in attorneys' fees and $5,537.62 in costs is appropriate.

## DISCUSSION

The facts underlying the award of fees and costs are set forth in the October 8 order and will not be repeated here, where the only issue is the amount to be awarded. As a threshold matter, however, the Court notes that much of plaintiffs' opposition essentially urges the Court to

1

reconsider its decision that an award of attorneys' fees is appropriate in this case. Plaintiffs argue, *inter alia*, that there is no statutory authority in the False Claims Act for an award of attorneys' fees against a purported "whistleblower" in a *qui tam* suit, and that the government has supposedly "adopted" this case by failing to move to dismiss it, as was its right. The Court has already considered and rejected these same arguments in its May 5, 2008 order denying plaintiffs' motion for reconsideration (see Docket No. 97) as being contrary to the plain language of 31 U.S.C. § 3730(d)(4), which authorizes attorneys' fees awards in appropriate cases where the government has declined to intervene. Accordingly, those arguments will not be addressed again here.

The decision to grant attorneys' fees under 31 U.S.C. § 3730(d)(4) and the amount of attorneys' fees to be awarded are within the discretion of the district court. See Mikes v. Straus, 274 F.3d 687, 704 (2d Cir. 2001). In the Second Circuit, "[t]he lodestar method is ordinarily the starting point in determining the amount of fees that may be awarded." Seitzman v. Sun Life Assurance Co. of Canada, Inc., 311 F.3d 477, 487 (2d Cir. 2002). Under this method, attorneys' fees are calculated by taking "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); cf. Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 190 (2d Cir. 2008) (advocating for the replacement of the term "lodestar" with "presumptively reasonable fee," but utilizing essentially the same basic methodology). A district court's "choice of rates [is] well within [its] discretion." Cabrera v. Jakabovitz, 24 F.3d 372, 393 (2d Cir. 1994).[1]

---

[1] Plaintiffs argue that a district court is within its discretion to reduce an hourly rate, but state that "it is not necessary to reach that issue" here because of what they believe to be a statutory cap of $125 per hour for a *qui tam* case under the False Claims Act pursuant to 31 U.S.C. §

2

1. Reasonable Hourly Rates

To determine the reasonable hourly rates, the Court must consider the factors enumerated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974),[2] while "bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." Arbor Hill, 522 F.3d at 190. "[T]he burden is on the fee applicant to produce satisfactory evidence – in addition to the attorneys' own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895-96 n. 11 (1984). The relevant "community" is "the district in which the court sits." Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997) (internal citations omitted).[3]

---

3730(g). The Court does not agree. Section 3730(g) limits attorneys' fees that may be awarded to a prevailing defendant in False Claims Act suits "brought . . . by the *United States*" (emphasis added). That section incorporates 28 U.S.C. 2412(d), which provides, in relevant part, that for purposes of a fee award to a prevailing party in an action brought by or against the United States, "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." However, this action was not brought by the United States, which declined to intervene in this case, but by plaintiffs. Where the government has declined to intervene, the provisions of § 3730(d)(4), which require only that the attorneys' fees awarded be "reasonable," apply.

[2] The twelve Johnson factors are: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." Arbor Hill, 522 F.3d at 186 n. 3 (citing Johnson, 488 F.2d at 717-19).

[3] While this Court sits in Brooklyn, decisions have recognized that there should not necessarily be differences between the fees awarded in this district and those awarded in the Southern District, at least where counsel for the party to be awarded the fees are located in Manhattan. See Nicholson v. Williams, No. 00-cv-2229 JBW, 2004 WL 4780498, at *11 (E.D.N.Y. June 2, 2004) ("Counsel who are located in Manhattan, and who have developed certain expertise through their Manhattan based practice, should not be penalized for representing clients in the Eastern District.").

Aside from their argument about the purported statutory "cap," which the Court has rejected, plaintiffs do not otherwise mount a specific challenge to the hourly rates sought by defendant. (Although plaintiffs do vehemently dispute the number of hours expended and the fees for certain work performed.) Nonetheless, the Court reviews the rates proposed by defendant *sua sponte* for reasonableness. Accord <u>Ass'n of Holocaust Victims for Restitution of Artwork and Masterpieces v. Bank Austria Creditanstalt AG</u>, No. 04 Civ. 360 (SWK), 2005 WL 3099592, at *4 (S.D.N.Y. Nov. 17, 2005) (reviewing fees sought by defendant for reasonableness even in absence of opposition by plaintiff's attorney).

The defense of this action was handled by defendant's counsel DLA Piper US LLP, a large, New York-based law firm, and primarily by partners Todd Marcus and Richard Fries. (See Affidavit of Todd B. Marcus dated Oct. 23, 2007 ("Marcus Aff."), ¶ 17). Mr. Marcus is a partner in the litigation practice group of DLA Piper with over 18 years experience as a commercial litigator who specializes in complex commercial matters, as well as real-estate and finance-related litigation. (Id. ¶ 18). Mr. Fries is also a partner at DLA Piper with 30 years of experience. His specialty is in commercial real estate matters. (Id. ¶¶ 20-21). Both Mr. Marcus and Mr. Fries have particular knowledge of and familiarity with M&T's servicing and foreclosure of the HUD-insured mortgage loans at issue in this case, having successfully moved to dismiss claims against M&T in a RICO action filed in 2001 in the Southern District by three St. Stephens entities (privies to plaintiffs here) to compel HUD to reject mortgage insurance claims filed by M&T. (Id. ¶¶ 9, 12). The Court notes too that Mr. Marcus and DLA Piper also represented M&T, along with co-counsel Zavatsky, Mendelsohn, Gross, Savino & Levy, LLP, in a foreclosure action by M&T on one of the St. Stephens properties that is pending before Judge

Joanna Seybert of our bench.[4]

Defendants seek fees at the following rates: $518.40 per hour for Mr. Marcus's work, based on a total discount of 19% that DLA Piper afforded M&T from Mr. Marcus's standard billing rate of $640 (id. ¶ 19);[5] $587.70 per hour for Mr. Fries's work, based on the same 19% discount on his standard billing rate of $725 per hour (id. ¶¶ 13, 23); $267.30 per hour for the work of Spencer Stiefel, a first-year associate at DLA Piper who contributed research, based on the 19% discount off Mr. Stiefel's standard billing rate of $330 per hour (id. ¶ 24); and between $162 and $190.80 per hour for paralegal time.[6]

In support of these billing rates, defendant attaches an excerpt from the National Law Journal's survey of 2006 billing rates at the 250 largest U.S. law firms and summarizes the billing rates at the New York-based firms that participated in the survey. (Id. ¶ 25 and Ex. J). Defendant notes that many of the larger, more prominent firms listed in the survey did not submit rates. (Id. ¶ 25). The rates of those firms that did submit figures range, for partners, from

---

[4] As noted in this Court's October 8, 2007 dismissal order, Judge Seybert's grant of summary judgment to M&T in that case, as well as the grants of summary judgment to M&T in 45 other foreclosure actions brought against St. Stephens in state court, provided the bases for this Court's dismissal of plaintiffs' claims on the grounds of *res judicata* and collateral estoppel. Those decisions were also the bases for this Court's holding that the present action was clearly frivolous and vexatious and that an award of attorneys' fees was appropriate. It is unclear from Mr. Marcus's affidavit whether DLA Piper was also involved in the preceding 45 state foreclosure actions or in the related bankruptcy case of In re St. Stephen's 350 East 116th St., 313 B.R. 161 (Bankr. S.D.N.Y. 2004), another decision that this Court relied upon in the October 8 order.

[5] According to Mr. Marcus, because of its longstanding relationship with M&T, DLA Piper afforded M&T a 10% discount on all billing rates and then discounted the billed amounts by a further 10%, making the effective total discount 19%. (Id. ¶ 23).

[6] Paralegal rates on the invoices attached to the Marcus Affidavit are listed at rates varying from $180 to $212 per hour, prior to the 10% total discount on the billed amounts, thus making the effective rates for paralegals between $162 and $190.80 per hour. The Court also notes that one of the invoices, for January 2007 (see Marcus Aff. Ex. C), bills for 2 hours of research by an associate named Stephanie Vogel, who bills at a rate of $491.00 per hour (prior to the discount). As Ms. Vogel is not mentioned in the Marcus Affidavit and does not appear again in any of the other invoices, the Court excludes this time from the final calculations.

$250 per hour on the low end to $800 on the high end and, for associates, from $160 to $550 per hour. (Id.). Accordingly, defendant argues that the rates sought for the work of Mr. Marcus, Mr. Fries, and Mr. Stiefel are well within the normal billing rates charged by large New York law firms for attorneys of similar levels of experience and expertise. (Id.).

The Court recognizes that the actual fee arrangement between a party and its counsel is relevant evidence of what constitutes a "reasonable" fee. See, e.g., Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp., 212 F. Supp.2d 226, 230 (S.D.N.Y. 2002) ("As numerous courts have recognized, negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness in the market . . . ."). Further, the Court does not quarrel with the contention that the rates sought for DLA Piper are within billing rates for comparable firms listed in the New York Law Journal's survey. Nonetheless, "courts have acknowledged that a judicial determination of what is 'reasonable' for purposes of a fee award to be paid by the losing party to the prevailing party in a litigation is not the same as the reasonableness of a bill that a law firm might present to its own paying client." Daiwa Special Asset Corp. v. Desnick, No. 00 Civ. 3856 (SHS), 2002 WL 31767817, at * 2 (S.D.N.Y. Dec. 3, 2002). Indeed, the Court notes that the rates sought by defendant here, while not unheard of, are somewhat higher than rates typically used by other courts for purposes of fee awards, even in cases involving complex litigation and where parties are represented by large or specialty New York-based law firms. See, e.g. Ass'n of Holocaust Victims, 2005 WL 3099592, at * 5 (approving rates of $350 per hour for partners and $225 per hour for junior associates at Strook & Strook & Lavan for work in connection with dismissal of a $6.8 billion lawsuit); Gucci America v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 525 (S.D.N.Y. 2004) (approving rates of $425 for the partner and $290 for the associate in a trademark infringement case); Auscape Int'l v. Nat'l Geographic Soc., No. 02

Civ. 6441 LAKHBP, 2003 WL 21976400, at *5 (S.D.N.Y. Aug. 19, 2003) (approving rates ranging from $215 to $495 per hour for attorneys at Latham & Watkins LLP for purposes of a sanctions award); Tokyo Electron Arizona, Inc. v. Discreet Indus. Corp., 215 F.R.D. 60, 62 (E.D.N.Y. 2003) (awarding fees at hourly rates of $400 for a partner, $280 for senior associate, $180 for junior associates, and $105 to $110 for paralegals); Weil v. Long Island Sav. Bank, 188 F. Supp. 2d 265, 269 (E.D.N.Y. 2002) (approving rates ranging from $371.00 to $450.00 per hour for partner at Hogan & Hartson in a consumer class action). But see Bianco v. Erkins, 284 B.R. 349, 352 (Bankr. S.D.N.Y. 2002) (approving rate of $535 per hour in 1999 and $595 per hour in 2000 for work done by a partner at Paul, Weiss, Rifkind, Wharton & Garrison); Yurman Designs, Inc. v. PAJ, Inc., 125 F. Supp. 2d 54, 58 (S.D.N.Y. 2000) (approving hourly rates of $520.69 for partner and $278.50 for associates for work done in 1999 by a mid-sized intellectual property law firm in a copyright case).[7] The rates sought here are also much higher than the rates used in cases that, on the whole, do not involve complex legal issues. See, e.g., La Barbera v. ESL Home Remodeling Inc., No. 06-CV-1372 (ARR)(CLP), 2007 WL 708359, at *6 (E.D.N.Y. Feb. 28, 2007) (awarding attorneys' fees at rates of $275 per hour for a partner, $150 per hour for associates, and $70 per hour for paralegals in ERISA matter); Alveranga v. Winston, No. 04-CV-4356, 2007 WL 595069, at *8 (E.D.N.Y. Feb. 22, 2007) (approving rates of $250 per hour to a sole practitioner licensed for 27 years and $185 for a sole practitioner licensed for 5 years in connection with work in defeating removal to federal court); La Barbera v. J.E.T. Resources, Inc., 396 F.Supp.2d 346, 353 (E.D.N.Y. 2005) (approving rates of $250 for partners, $150 for associates, and $60 for paralegals per hour for legal services performed in connection

---

[7] The Court is aware that not all of these decisions are of recent vintage, and that a court should "take into account the rapidity with which such rates can rise." Tokyo Electron, 215 F.R.D. at 63.

7

with "simple and straightforward" appeal in ERISA matter).

Even assuming that the rates sought by defendant are within the range for comparable awards in other cases, the Court believes these rates to be somewhat excessive for the particular type of work performed in *this* case. See Arbor Hill, 522 F.3d at 184 n. 2 ("the nature of representation and type of work involved in a case are critical ingredients in determining the 'reasonable' hourly rate"). To be sure, judged solely by the allegations of the complaint – alleging a complex fraudulent scheme that, if proven, could have resulted in hundreds of millions in liability – this case was an important one for the defendant. And, as noted, Mr. Fries and Mr. Marcus brought considerable expertise to this lawsuit, having litigated similar if not identical issues against these parties or their privies before. However, the central issue in this case – whether M&T knew of fraud in the origination of the loans to St. Stephens entities at the time of purchase – was neither novel nor complex. Pointedly, the basis for the Court's dismissal (and for its award of attorneys' fees) was that this issue had been litigated numerous times in numerous forums by these same parties prior to commencement of this case. In concrete terms, this case did not involve discovery, court appearances (save one early pre-motion conference), or particularly difficult questions of law and fact. Defendant certainly has not pointed to particular complexities in this litigation that would justify rates at the highest end of the spectrum.[8] Accord Alveranga, 2007 WL 595069, at *7 (noting that "[r]ates awarded . . . in cases not involving complex issues tend, on average, to be lower"); AFP Imaging Corp. v. Philips Medizin Sys., No. 92-Civ. 6211 (LMM), 1994 WL 698322, at *3 (S.D.N.Y. Dec. 13, 1994) (noting that defendant's

---

[8] By way of comparison, the Court notes that in 2004, in the bankruptcy court, M&T's counsel Zavatsky, Mendelsohn litigated similar issues and successfully moved for an award of sanctions against the attorney for certain of the St. Stephens entities. See In re St. Stephen's, 313 B.R. at 172. In that case, counsel sought and was granted an award of sanctions at a rate of $175 per hour, which was apparently half of counsel's normal billing rate (*i.e.,* $350 per hour). Id.

counsel, Sullivan & Cromwell, "has ably represented its client throughout this action and I have no question as to their ability to command hourly rates such as those cited. Nevertheless, because the matters in issue in this application were not complex and the Court must determine what costs are fair to impose on an adversary, the lodestar award will be based upon hourly rates at the lower end of the range cited by Defendant.").

Bearing all of these factors in mind, the Court finds that reasonable hourly rates, for purposes of this fee award, are as follows: for Mr. Fries, $250 per hour; Mr. Marcus, $250; and for Mr. Stiefel, $150.[9] As for paralegal time, the Marcus Affidavit is silent as to the rates charged for paralegal time at similar firms. Based on the authorities cited above, the Court finds that $75 per hour is a reasonable rate for paralegal time. The Court finds that these rates are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum, 465 U.S. at 895-96 n. 11.

2. Reasonableness of Hours Expended

The Court next turns to the question of whether the hours expended by counsel for defendant were reasonable in an action of this nature. In this inquiry the Court is guided by the Second Circuit's instruction that the court looks to "its own familiarity with the case and its experience with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992) (citations omitted). The relevant issue is "whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992). A district court should exclude hours that were "excessive, redundant, or

---

[9] As noted, Mr. Stiefel is a first-year associate and contributed approximately 20 hours of research. As defendants have not supplied the Court with any other information regarding Mr. Stiefel's particular qualifications or contributions, the Court believes that $150 per hour, near the lower end of rates used in other cases for work by junior associates, is an appropriate rate.

9

otherwise unnecessary" to the litigation due to, for example, "overstaff[ing]." Hensley, 461 U.S. at 434.

The party seeking the award bears "the burden of documenting the hours reasonably spent by counsel," King v. STL Consulting, LLC, No. 05 CV 2719(SJ), 2006 WL 3335115, at *6 (E.D.N.Y. Oct. 3, 2006) (citations omitted), and thus must support its request by providing contemporaneous time records reflecting, "for each attorney [and legal assistant], the date, the hours expended, and the nature of the work done." New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983). The records submitted with the Marcus Affidavit include bills sent to M&T for the months December 2006 to July 2007 containing daily time entries for each attorney and paralegal who worked on the case, which are sufficient to satisfy the time record requirement.[10] See Cruz v. Local Union No. 3 of Intern. Broth. of Elec. Workers, 34 F.3d 1148, 1160 (2d Cir. 1994). According to those records, Mr. Marcus logged 246.1 hours in the defense of this action and Mr. Fries, 138.2 hours. (Marcus Aff. ¶ 13). Their time was spent, *inter alia*: reviewing the pleadings in this case and the materials in the prior litigations; performing legal research on issues of *res judicata* and collateral estoppel, the *Rooker-Feldman* doctrine, and various facets of the False Claims Act; drafting and revising letters and papers submitted in connection with M&T's motion to dismiss; drafting and revising letters and papers submitted in connection with plaintiffs' motion for recusal; correspondence and research relating to plaintiffs' anticipated motion to have Mr. Marcus disqualified; and fees and expenses incurred in connection with a July 9, 2007 press release issued by plaintiffs' counsel about this lawsuit. (Id. ¶¶ 8-13). In support of the hours

---

[10] The $244,408.02 amount that defendant seeks does not include legal fees and expenses incurred in connection with defendant's opposition to plaintiffs' motion for reconsideration or with any other work performed subsequent to July 31, 2007. See Marcus Aff. n. 8.

claimed, defendant also points to the "no holds barred" manner in which plaintiffs have litigated, including the aforementioned press release, recusal motion, and threatened disqualification motion (id. ¶ 8), as well as their lengthy, frequent, and convoluted submissions. (Id. ¶ 13). In addition to Mr. Fries's and Mr. Marcus's work, Mr. Stiefel contributed 23.2 hours of research, and paralegals contributed 21.1 hours. (Id. ¶ 17).

Plaintiffs argue that many of the hours expended by defendant's counsel were either excessive or outside the scope of this litigation. For instance, plaintiffs argue that any work related to ethical charges brought by plaintiffs before the Appellate Division, First Department's Disciplinary Committee against Mr. Marcus (see id. Ex. H) would be outside the scope of the defense of this case. Similarly, plaintiffs claim that defendant cannot recover for hours expended by counsel in the aftermath of the July 2007 press release. (See id. Ex. I). Plaintiffs also take issue with the amount of work performed by counsel in December 2006 and January 2007 in relation to plaintiffs' anticipated motion for Mr. Marcus's disqualification, a motion that plaintiffs never made. Finally, plaintiffs dispute the number of hours spent in researching and preparing defendant's motion to dismiss. The primary issues of collateral estoppel and *res judicata*, they contend, could have been researched by a first-year law student "in a couple of hours," and the issue had been previously briefed in the foreclosure action before Judge Seybert.

The Court addresses each of these objections in turn. First, as to the work performed in relation to the Disciplinary Committee proceedings: Mr. Marcus's affidavit is silent, but it does appear on the bill submitted to M&T for June 2007 (id. Ex. H) and is included in the fee award sought here. The invoice for June 2007 indicates approximately 10 hours of time expended by Mr. Marcus and Mr. Fries that appears to be related to the Disciplinary Proceedings, for a total bill, with expenses, of $5,570.95. Although the Court notes that the ethics charges do stem from

disputes arising out of this litigation (and also relate to the litigation before Judge Seybert), the Court is unable to determine how much of this work, if any, was reasonable and necessary to M&T's defense in *this* case.[11] Accordingly, the Court will deduct the hours expended and expenses incurred by defendant's counsel in June 2007 from the fee award.

Second, as to work performed in the aftermath of the July 2007 press release: it is also not clear to the Court why this work should be included in the fee award. As stated in Mr. Marcus's affidavit, the July 2007 press release publicized this lawsuit and claimed that certain statements attributed to Mr. Marcus "could also result in a number of criminal indictments." (Id. ¶ 12). A review of the relevant time records for July 2007 shows that Mr. Fries and Mr. Marcus billed 27.30 hours (resulting in a total bill of $15,330.27) in the wake of this press release, some of which was related to an M&T investor call and some of which appears to be related to the case before Judge Seybert. (Id. Ex. I). Although the Court recognizes that this press release was certainly part of plaintiffs' overall strategy in litigation with M&T, the Court cannot determine, from the July 2007 bill, what work was reasonable for M&T's defense in this action, as opposed to what work was related to the action before Judge Seybert or what work was reasonable for DLA Piper's representation of M&T more generally.[12] Accordingly, the Court will also deduct the hours and expenses in July 2007 from the fee award.

Third, with regard to plaintiffs' challenge to what they characterize as fees and expenses relating to defense preparation for plaintiffs' threatened motion for disqualification of Mr. Marcus, plaintiffs fail to show how they determined that 100 hours of time and $63,000 in fees

---

[11] The Court is mindful that there are no entries on the docket in this case for June 2007, so it must assume that the work is more likely to be directly related to the disciplinary proceedings and to the case before Judge Seybert.

[12] Again, just as for June 2007, there are no entries on the docket of this case during the month of July 2007.

charged by defendants related only to the threatened disqualification of counsel and were, therefore, excessive. The Court's own review of the relevant time records (from December 2006 and January 2007) shows that the only entries that are even arguably related to the disqualification issue add up to somewhere between 30 and 40 attorney hours. (Id. Exs. B and C).[13] That amount, if accurate, may be somewhat excessive to prepare for a threatened disqualification motion that was not actually made, and the Court will take this into account in its final review of the hours expended. However, the Court rejects plaintiffs' contention that only an "hour" of attorney time in connection with this disqualification issue would be reasonable.

Finally, the Court has thoroughly examined the records of the hours submitted in connection with defendant's motion to dismiss and plaintiffs' motion for recusal, and finds that not all of the work performed was reasonably necessary to the defense of this action as it was litigated. For instance, the Court notes that Mr. Fries and Mr. Marcus billed nearly 90% of some 420 hours expended in connection with the total defense of this action, most of which was devoted to these two motions. Although the Court recognizes that Mr. Fries and Mr. Marcus each brought particular expertise to this case, it is not clear to the Court why it was reasonable for both attorneys, as senior partners who bill at quite high rates, to expend so many hours here. Indeed, the majority of the work performed by these two senior litigating attorneys involved research for and drafting of briefs related to these motions – *i.e.*, the types of work that, in the

---

[13] The bills for December 2006 and January 2007 together *total* some 123 hours of attorney time resulting in approximately $67,000 in fees, yet most of the work reflected on these bills was related to defendant's motion to dismiss, not to plaintiffs' threatened motion for disqualification. The Court notes, however, that many of the bills submitted by defendant utilize so-called "block billing," *i.e.*, using a single time entry for a variety of distinct tasks, which "has a tendency to obfuscate the amount of time expended on distinct tasks and introduces an element of vagueness into a fee application, making it difficult to determine if the reported hours are 'duplicative or unnecessary.'" Ass'n of Holocaust Victims, 2005 WL 3099592, at * 5 (citations omitted). Thus, it is not entirely possible to separate how much work was expended on the disqualification issue as opposed to the motion to dismiss more generally.

Court's experience, will typically be done (at least in substantial part) by attorneys less senior, especially at firms of DLA Piper's size.[14] While the Court appreciates that this matter may have been staffed "leanly and efficiently," as defendant argues, defendant has not adequately explained to the Court why it could not have delegated more work to less senior attorneys who bill at lower rates.[15]

The Court is also concerned that the total number of hours billed, over 400 hours in connection with these two motions, "may exceed what was reasonably required for the tasks at hand." Ass'n of Holocaust Victims, 2005 WL 3099592, at *6. In particular, although there were new issues in this case peculiar to the False Claims Act (and while defendant understandably relied on multiple grounds in moving to dismiss), the Court determined that the complaint here was clearly frivolous, given that the central issue of M&T's fraud had been litigated numerous times over by these parties or their privies in prior litigations. Thus, while time-consuming review of these earlier actions may have been necessary, "comprehensive briefing of complex legal issues was minimal." Id. Nor, as noted, did the case involve time-consuming discovery, depositions, or extensive court appearances. Even granting that plaintiffs' litigation strategy and their convoluted submissions did increase the total amount of work required by defendant, the Court cannot escape the conclusion that the amount of time expended here, especially by two senior attorneys, was excessive for purposes of securing the dismissal of a clearly frivolous case.

---

[14] For instance, during the months of February and March 2007, Mr. Fries and Mr. Marcus billed some 200 combined hours, mostly related to briefing of these two motions, with almost no assistance from other attorneys whatsoever. (Id. Exs. D and E).

[15] It is important to emphasize once again that, from an ethical or client relations standpoint, there was absolutely nothing inappropriate about DLA Piper's staffing of the defense. The fact that experience suggests an acceptable and effective level of legal service was hypothetically obtainable at a more reasonable rate, on the other hand, must be reflected in the Court's assessment of reasonable fees to be awarded in derogation of the ordinary American rule that each side bears its own expense of litigation.

14

Accord Clarke, 960 F.2d at 1153 (2d Cir. 1992) (affirming district court's decision to reduce hours sought for a bench trial from 400 hours to 120 where case was not complex and did not involve novel areas of law, and where counsel took no depositions and performed little discovery).[16]

"[I]n dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application.'" Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (citing New York State Ass'n for Retarded Children, 711 F.2d at 1146); see also DeVito v. Hempstead China Shop, Inc., 831 F. Supp. 1037, 1045 (E.D.N.Y. 1993) (reducing attorneys' fee request by 40% due to duplication of work, vague descriptions of some of the work performed and the necessity of the work); Ass'n of Holocaust Victims, 2005 WL 3099592, at *7 (deducting fee request by 25% to account for block billing, vagueness, and excess). Here, based on all of the foregoing factors, the Court will deduct 30% in the number of hours billed by Mr. Fries and Mr. Marcus, after also excluding the work performed in June and July 2007, as discussed above. The Court finds that the time billed by Mr. Stiefel for research and the work performed by paralegals was reasonable and, consequently, will not apply the percentage reduction to their time.

As a result, the lodestar figure or "presumptively reasonable fee" in this case is calculated as follows:

| Attorney | Reasonable Hourly Rate | Reasonable Hours | Total |
|---|---|---|---|
| Richard Fries | $250 | 84.21 | $21,052.50 |
| Todd Marcus | $250 | 158.97 | $39,742.50 |

---

[16] This is not to say, of course, that defendant should be penalized for succeeding in having a frivolous complaint dismissed. But, in a case where the dispositive issue had largely been researched and briefed prior to motion practice here, the reasonable amount of time spent in putting together motion papers must necessarily be less than in cases involving new or complex issues of law.

15

| Scott Stiefel | $150 | 23.2 | $3,480.00 |
| Paralegals | $75 | 21.1 | $1,582.50 |
| **TOTAL** | | | **$65,857.50** |

3. Adjustments

Although there is a presumption that this lodestar figure represents a reasonable fee, "[t]he product of reasonable hours times a reasonable rate does not end the inquiry." Hensley, 461 U.S. at 434. Other factors may result in an upward or downward departure from the adjusted lodestar or presumptively reasonable fee so far computed, most crucially, the "degree of success" obtained. Id.; see also Farrar v. Hobby, 506 U.S. 103, 114 (1992) (quoting Hensley, 461 U.S. at 436). In this case, defendants were successful in moving to dismiss all of plaintiffs' claims, which would ordinarily entitle them to compensation based upon the full adjusted lodestar amount.

One question that remains, however, is only tangentially addressed by the parties here: whether the plaintiffs can afford to pay the full computed amount. As the Second Circuit has explained, "because fee awards are at bottom an equitable matter . . . courts should not hesitate to take the relative wealth of the parties into account." Faraci v. Hickey-Freeman Co., Inc., 607 F.2d 1025, 1028 (2d Cir. 1028); Sassower v. Field, 973 F.2d 75, 81 (2d Cir. 1992) ("[W]hen a court awards defendants attorney's fees, it must take into account the financial circumstances of the plaintiff."). At the same time, "[w]here the plaintiff can afford to pay, of course, the congressional goal of discouraging frivolous litigation demands that full fees be levied." Faraci, 607 F.2d at 1028. Thus, the district court should ascertain whether, in light of a plaintiff's ability to pay, a "lesser sum assessed would . . . fulfill[] the statute's deterrent purpose without subjecting him to financial ruin." Id. at 1029. See, e.g., Tancredi v. Metropolitan Life Ins. Co., No. 00 Civ. 5780 (LAK) (JCF), 2003 WL 22299203, at * 6 (S.D.N.Y. Oct. 7, 2003) (reducing

award sought in connection with dismissal of frivolous action from approximately $250,000 to $30,000 based upon plaintiffs' demonstration of financial hardship through statements of assets, liabilities, and income); Parker v. Sony Pictures Entertainment, No. 97 Civ. 0264 (LAK), 2000 WL 1534695, at * 2 (S.D.N.Y. Oct. 17, 2000) (plaintiff's submission as to assets and liabilities "demonstrate[d] his inability to pay any substantial award, at least without the gravest hardship").

Here, plaintiffs do not directly claim an award of attorneys' fees would cause them substantial financial hardship and certainly do not offer any proof as to their own finances. However, they do make several statements that reference the parties' respective wealth. For instance, they contend that the "totality of circumstances" in this case calls for no more than a nominal award because the St. Stephens entities that they represent were victims of the original fraudulent mortgages – whereas, M&T recouped monies from HUD. In support of this request for a nominal award, plaintiffs also note that the government never moved to dismiss the case if it determined that it was frivolous, leading plaintiffs into what they claim was a "hostile ambush" of sanctions. Plaintiffs have also, at previous times during the course of this litigation, made oblique references to the financial status of at least some of the named individuals in the complaint. See, e.g., Memorandum in Support of Plaintiff's Motion for Reconsideration (Docket No. 82), at 18 (alleging that "Plaintiffs happen to be four old men, three of whom are on social security. Two of them are poor black men. A third is eighty years of age."); see also Affirmation in Opposition to Attorney Fees (Docket No. 79), at 20 (noting that Mr. Pugach has turned the attorneys' fees claim over to his insurance carrier) These bald assertions aside, plaintiffs offer no admissible proof of their financial circumstances or ability to pay.

Accordingly, the Court finds that plaintiffs have not demonstrated any financial hardship

17

that would justify a reduction in the computation of a reasonable fee award. Much of plaintiffs' argument in support of a "nominal award", e.g., that the government did not move to dismiss their case, essentially amounts to yet another request that the Court reconsider its decision that this action was clearly frivolous and vexatious. Moreover, the unsupported assertions about the ages, race, and wealth of certain of the four named plaintiffs, without any specific evidence of relevant assets, liabilities, or income of each of them, fall far short of the submissions that ordinarily would accompany a plea of financial hardship. See, e.g. Tancredi, 2003 WL 22299203, at * 6; Parker, 2000 WL 1534695, at * 2. Certainly, the extensive history of litigation among these parties arising out of the St. Stephens mortgaging suggests that plaintiffs have, over the years, managed to marshal and finance significant legal assistance in pursuing frivolous claims or defenses against the defendant, and that the "nominal" award they request now would do little to deter them from filing frivolous lawsuits in the future. As a result, the Court finds that no equitable circumstances warrant a reduction in the amount the Court has otherwise determined to be a reasonable fee award.

## Costs

Defendant also seeks to recover $26,644.51 for litigation costs incurred by DLA Piper – $20,648.94 for electronic legal research, $3,426.50 for retrieval of documents from court files, and the remainder for delivery, duplicating, and service of documents.

Pursuant to 28 U.S.C. § 1920 and Local Rule 54.1, taxable costs, such as filing fees and monies expended for printing, copying, etc. are shifted to the losing party. Nontaxable costs also are shifted to the losing party in a case such as this where a statute provides for the shifting of attorneys' fees, as long as these costs are "[i]dentifiable, out-of-pocket expenses," as opposed to "non-recoverable routine office overhead, which must normally be absorbed within the

attorney's hourly rate." Kuzma v. I.R.S., 821 F.2d 930, 933-34 (2d Cir. 1987). The Court has carefully reviewed defendant's invoices and has determined that, with the exception of those costs listed on the June and July 2007 invoices (as discussed above), the expenditures for duplicating, delivery, and court file retrieval are all reasonable. Therefore, the Court awards $5,537.62 for these items.

As to the costs of electronic research, the Second Circuit has recognized that such costs are compensable as attorneys' fees and may be awarded, but only where the charges are not already accounted for in the attorneys' hourly rates. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 369 F.3d 91, 98 (2d Cir. 2004) (per curiam) ("[T]he use of online research likely reduces the number of hours required for an attorney's manual search, thereby lowering the lodestar, and . . . in the context of a fee-shifting provision, the charges for such online research may properly be included in a fee award."); U.S. v. Merritt Meridian Constr. Corp., 95 F.3d 153, 173 (2d Cir. 1996) (noting that "computer research is merely a substitute for an attorney's time that is compensable under an application for attorneys' fees and is not a separately taxable cost."); Fink v. City of New York, 154 F. Supp. 2d 403, 415 (E.D.N.Y. 2001). The Court construes defendant's request for such fees as a representation that the electronic research charges are not subsumed in DLA Piper's hourly rates. The Court awards the cost of computerized research as an attorney's fee, not a separately taxable cost. However, as with the hours expended, the Court finds that the amount spent on electronic research is excessive. Therefore, the Court reduces those fees by 25%, after also excluding minimal fees for online research for June 2007, to $15,446.33. All other costs not explicitly awarded are denied.

## Conclusion

For the reasons set forth above, defendant will be awarded $81,303.83 in attorneys' fees

and $5,537.62 for costs incurred in the defense of this action. Plaintiffs are jointly and severally liable for the amounts awarded.

This order fixing the amount of attorneys' fees and costs to be awarded to the defendant now resolves all motions pending before the Court, and plaintiffs' complaint has been dismissed.[17] The Clerk of the Court is directed to enter Judgment in accordance with this Memorandum and Order and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
June 4, 2008

s/ENV

ERIC N. VITALIANO
United States District Judge

---

[17] On May 20, 2008, the Court received a letter from plaintiffs' counsel arguing that the Court's May 13 vacatur of its earlier grant of *pro se* status to Mr. Pugach was in error. Counsel informs the Court that Mr. Pugach no longer wishes to represent the government but only wishes to represent himself in regard to M&T's "right to attorney's fees against him personally." As noted in the May 13 order, however, Mr. Pugach appears in this case *only* as a relator on behalf of the government and, consequently, may not represent himself in any capacity. In any event, even if Mr. Pugach could seek *pro se* status for this limited purpose, Mr. Pugach's most recent request to proceed *pro se* was sent long after briefing as to the attorneys' fees issue was complete. Pursuant to the October 8, 2007 order, the Court directed and received submissions both from defendant and plaintiffs as to the attorneys' fees issue. Thus, having previously afforded all parties the right to be heard on this issue, the Court will not now re-open the matter for further briefing by any party.